## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| EBONI BROWN, TANIQUE CLARKE, TRAVIS JOHNSON, DOMINIC GREETAN, FRIDAY FRAZIER, and KEISHA RABON, *individually and on behalf of all others similarly situated,* | Case No. |
| Plaintiffs, | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| CHICK-FIL-A, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Eboni Brown, Tanique Clarke, Travis Johnson, Dominic Greetan, Friday Frazier, and Keisha Rabon, individually and on behalf of all others similarly situated, complain and allege upon information and belief based, among other things, upon the investigation made by Plaintiffs and through their attorneys as follows:

## NATURE OF ACTION

1.      This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant Chick-fil-A, Inc. ("Defendant" or "Chick-fil-A"), arising from its deceptive and untruthful promises to provide FREE or flat fee, low-price delivery on food deliveries ordered through its app and website.

2.      Since the beginning of the Covid-19 pandemic, Chick-fil-A has moved aggressively into the food delivery business, exploiting an opportunity presented by Americans' reduced willingness to leave their homes.  To appeal to consumers in a crowded food delivery

1

marketplace during the national crisis, early in the pandemic Chick-fil-A began promising its customers "FREE DELIVERY" or low-price delivery in its mobile application and on its website, usually in the amount of $2.99 or $3.99.

3. These representations, however, are false, because that is not the true cost of having food delivered by Chick-fil-A. In fact, Chick-fil-A imposes hidden delivery charges on its customers in addition to the low "Delivery Fee" represented in its app and on its website.

4. On delivery orders only, Chick-fil-A secretly marks up food prices for delivery orders by a hefty 25-30%. In other words, the identical order of a 30-count chicken nuggets costs approximately $5-6 more when ordered for delivery than when ordered via the same mobile app for pickup, or when ordered in-store.

5. This hidden delivery upcharge makes Chick-fil-A's promise of FREE or low-cost delivery patently false.  The true delivery costs are obscured, as described above, and far exceed its express representation that its "Delivery Fee" is FREE or a flat fee of only $2.99 or $3.99.

6. By falsely marketing a FREE or low-cost delivery charge, Chick-fil-A deceives consumers into making online food purchases they otherwise would not make.

7. Worse, Chick-fil-A was aware of consumer confusion regarding the secret menu upcharge and knew consumers were and would be deceived by hidden menu price markups of which they were not aware. Nonetheless, Chick-fil-A never informed its consumers of the menu price markup.

8. Upon information and belief, Chick-fil-A adopted its pricing strategy because it believed that consumers would make more purchases if Chick-fil-A misrepresented the true cost of delivery by offering FREE or low-cost delivery, then secretly inflating menu prices on delivery orders only.

9.      Chick-fil-A intentionally deceived its customers regarding the true cost of its delivery service, hiding its delivery charges in menu price markups it never disclosed to its customers. Chick-fil-A did this because it was unhappy with the profitability and sales generated by truthful advertisements.

10.     In fact, when Chick-fil-A first began offering delivery services in 2019, it offered a fair, truthful and transparent delivery fee of $4.99 *without* secretly marking up menu prices in any way on delivery orders. Later, however, Chick-fil-A decided that it could increase the profitability and sales generated by its delivery service by lying about its delivery charges to its customers.

11.     Specifically, early in the national Covid-19 crisis, Chick-fil-A saw an opportunity for exploitation. It claimed to *reduce* its delivery fee to FREE, $2.99 or $3.99 in order lure customers into making delivery purchases from Chick-fil-A in a crowded food delivery marketplace. But unbeknownst to those customers, at the same time Chick-fil-A secretly raised its menu prices on delivery orders only in order to cover the costs of delivery and profit—without once disclosing the manipulation to customers.

12.     Chick-fil-A continues to misrepresent the nature of the delivery charges assessed on the Chick-fil-A mobile application and the website, by issuing in-app and online marketing materials that fail to correct reasonable understandings of its FREE or low-cost delivery promises, and that misrepresent the actual costs of the delivery service.

13.     Specifically, Chick-fil-A omits and conceals material facts about the Chick-fil-A delivery service, never once informing consumers in any disclosure, at any time, that the use of the delivery service causes a substantial increase in food prices.

14.     Hundreds of thousands of Chick-fil-A customers like Plaintiffs have been assessed

hidden delivery charges they did not bargain for.

15.     Consumers like Plaintiffs reasonably understand Chick-fil-A's express "Delivery Fee" representation to disclose the total additional cost they will pay as a result of having their food delivered, as opposed to ordering online and picking up food in person, or ordering and picking up food in person.

16.     By unfairly obscuring its true delivery costs, Chick-fil-A deceives consumers and gains an unfair upper hand on competitors that fairly disclose their true delivery charges. For example, other restaurants such as Del Taco and El Pollo Loco both offer delivery services through their app and website. But unlike Chick-fil-A's current practice, Del Taco and El Pollo Loco fairly and prominently represent their true delivery charges—just as Chick-fil-A used to do.

17.     Plaintiffs seek damages and, among other remedies, injunctive relief that fairly allows consumers to decide whether they will pay Chick-fil-A's delivery mark-ups.

## **PARTIES**

18.     Plaintiff Eboni Brown is a citizen of Virginia who resides in Mechanicsville, Virginia.

19.     Plaintiff Tanique Clarke is a citizen of Virginia who resides in Henrico, Virginia.

20.     Plaintiff Travis Johnson is a citizen of Texas who resides in Forth Worth, Texas.

21.     Plaintiff Dominic Greetan is a citizen of Arkansas who resides in Bentonville, Arkansas.

22.     Plaintiff Friday Frazier is a citizen of Maryland who resides in Elkridge, Maryland.

23.     Plaintiff Keisha Rabon is a citizen of South Carolina who resides in Gallivants Ferry, South Carolina.

24.     Defendant, Chick-fil-A Inc. is incorporated in Georgia and maintains its principal

business offices in Atlanta, Georgia.

## JURISDICTION AND VENUE

25.     This Court has original jurisdiction of this action under the Class Action Fairness

Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d), this Court has original jurisdiction because (1) the

proposed class is comprised of at least 100 members; (2) Plaintiffs are citizens of Virginia, Texas,

Arkansas, Maryland, and South Carolina, making at least one member of the proposed class a

citizen of a different state than Defendant; and (3) the aggregate claims of the putative class

members exceed $5 million, exclusive of interest and costs.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant

Chick-fil-A is headquartered and transacts business in this district. Also, a substantial portion of

the events or omissions giving rise to the claims asserted herein occurred in this district.

## COMMON FACTUAL ALLEGATIONS

**A.     Food Delivery Services Increase in Popularity, and then Explode in Popularity During the Pandemic.**

27.     In 2018, the online food delivery industry was an astounding $82 billion in gross

revenue and projected to exceed $200 billion by 2025.[1]

28.     US Foods reports that the average American consumer has two food delivery apps

installed on their mobile phone and uses those apps three times per month.[2]

29.     The online food delivery industry predominately influences the country's most

financially vulnerable populations. A nationwide research study conducted by Zion & Zion reveals

---

[1] *See* Frost & Sullivan, *$9.6 Billion in Investments Spurring Aggressive Expansion of Food Delivery Companies,* October 25, 2019, accessible at https://ww2.frost.com/news/press-releases/9-6-billion-in-investments-spurring-aggressive-expansion-of-food-delivery-companies/, last accessed January 19, 2021.

[2] *See* US Foods, *New Study Shows What Consumers Crave in a Food Delivery Service,* 2019, accessible at https://www.usfoods.com/our-services/business-trends/2019-food-delivery-statistics.html, last accessed January 19, 2021.

that the largest user markets for online delivery food services are the young and the poor.[3] During a 90-day timeframe, 63% of consumers between the ages of 18 and 29 used a multi-restaurant delivery website or app service, followed by 51% of consumers between the ages of 30 to 44.[4] The study also demonstrated that the "less income a consumer earns, the more likely the consumer is to take advantage of restaurant delivery services," as those earning less than $10,000 per year ordered online delivery the most (51.6%).[5]

30.     Put plainly, the allure for online food delivery services has historically been based upon pure convenience. A 2019 Gallup study of third-party delivery services companies like GrubHub, DoorDash, and Uber Eats reported 72% of customers order online food delivery because they don't want to leave their house; 50% so that they can continue with their ongoing activities; and 41% to avoid bad weather.[6]

31.     According to data compiled by Yelp, food delivery orders have *doubled* since the Covid-19 outbreak began.[7]

32.     The arrival of the unprecedented Covid-19 pandemic escalated the value of online food delivery services from one of pure convenience to that of a comforting necessity for many consumers who are sick, in a high-risk population group for Covid-19, or simply do not feel safe

---

[3] *See* Aric Zion and Thomas Hollman, Zion & Zion Research Study, *Usage and Demographics of Food Delivery Apps,* accessible at https://www.zionandzion.com/research/food-delivery-apps-usage-and-demographics-winners-losers-and-laggards/, last accessed January 19, 2021.

[4] *Id.*

[5] *Id.*

[6] *See* Sean Kashanchi, Gallup, *Third-Party Delivery Will Grow; Is Your Restaurant Ready?,* May 6, 2019, accessible at https://www.gallup.com/workplace/248069/third-party-delivery-grow-restaurant-ready.aspx, last accessed January 19, 2021.

[7] *See* Tal Axelrod, The Hill, *Yelp: Delivery and take-out twice as popular as usual amid coronavirus,* March 20, 2020, available at https://thehill.com/policy/technology/488749-yelp-delivery-and-take-out-twice-as-popular-as-usual-amid-coronavirus, last accessed January 19, 2021.

to leave their homes and venture out into the public to purchase food during quarantine.

33.     In its 2019 Economic Report conducted by research firm Technomic, DoorDash reported that 86% of customers agreed that DoorDash played an important role in helping them access food during the pandemic and 77% of consumers increased their use of third-party delivery services during this time.[8] Indeed, amidst the uncertainty of the novel virus, 68% of consumers now view ordering food online for delivery as the safer option.[9]

34.     The era of Covid-19 undoubtedly caused a significant revenue boom for third party delivery services. SEC filings indicate that the top four U.S. food-delivery apps (DoorDash, Uber Eats, GrubHub, and Postmates) collectively experienced a *$3 billion increase* in revenue in just two quarters, April through September, following the enactment of shelter-in-place restrictions throughout the nation.[10]

35.     The ramp up in utilization of food delivery services also had a massive positive impact on restaurant owners who were quickly on the brink of facing permanent closures during lockdown: 67% of restaurant operators said DoorDash was crucial to their business during Covid-19 and 65% say they were actually able to *increase* profits during this time because of DoorDash.

36.     In the wake of the food delivery surge, Consumer Reports highlighted the need for

---

[8] *See* Technomic and DoorDash, 2019 Economic Impact Report, *The Impact of DoorDash on Economic Activity and Restaurant Resilience,* available at https://doordashimpact.com/media/2019-Economic-Impact-Report.pdf, last accessed January 19, 2021.

[9] *Id.*

[10] *See* Levi Sumagaysay, Market Watch, *The pandemic has more than doubled food-delivery apps' business. Now what?,* last updated November 27, 2020, available at https://www.marketwatch.com/story/the-pandemic-has-more-than-doubled-americans-use-of-food-delivery-apps-but-that-doesnt-mean-the-companies-are-making-money-11606340169, last accessed January 19, 2021.

fee transparency for consumers who use these apps and services.[11] A research team investigated food delivery companies and the report measured their compliance with new rules regarding fees enacted in seven US cities aimed at protecting consumers and businesses during the pandemic. It found that these companies continued to not comply with the new ordinances and continued to "employ design practices that obfuscate fees." They concluded that "[c]onsumers deserve to have informed choices to understand what they are being charged for *and* how their dollars spent impacts the restaurants they support and patronize in their communities."

**B.    Chick-fil-A's App and Website Fails to Bind Users to Any Terms of Service.**

37.    When a consumer downloads the Chick-fil-A app, or uses the Chick-fil-A website, he may create an account in order to place an order for delivery or pickup.

38.    In order to do so, a user enters in a name and contact information.

39.    While the account creation screen contains a small hyperlink to view Chick-fil-A's Terms of Service and Privacy Notice, users are not required to affirmatively consent to such terms, such as by clicking or checking a box.

**C.    Prior to the Pandemic, Chick-fil-A Offered a $4.99 Delivery Fee with No Menu Price Markup, Then Discovered It Could Increase Sales by Shifting Delivery Costs to Hidden Menu Upcharges.**

40.    Chick-fil-A first began offering delivery services in 2019. At that time, it offered a truthful and transparent delivery fee of $4.99 *without* secretly marking up menu prices in any way on delivery orders.

41.    Specifically, it promised "Delivery Fee: $4.99" during the checkout process and did not mark-up menu prices on delivery orders. This was a clear promise that the total, marginal

---

[11] *See* Consumer Reports, *Collecting Receipts: Food Delivery Apps & Fee Transparency,* September 29, 2020, accessible at https://digital-lab-wp.consumerreports.org/wp-content/uploads/2020/09/Food-delivery_-Report.pdf, last accessed January 19, 2021.

cost of having food delivered versus picking it up in store was represented by the $4.99 Delivery Fee.

42.     However, Chick-fil-A was not content with the profitability and sales generated by its delivery service, and decided that it could increase the profitability and sales generated by its delivery service by lying about its delivery charges to its customers.

43.     Chick-fil-A was aware of consumer confusion regarding the secret menu upcharge. Upon information and belief, Defendant was or should have been aware that consumers were and would be deceived by hidden menu price markups. Nonetheless, Chick-fil-A never informed its consumers of the menu price markup.

44.     Chick-fil-A intended for consumers to make more purchases as a result of Chick-Fil-A lowering its delivery fee and raising menu prices in order to cover delivery costs and profit on the delivery service.

45.     So that is precisely what Defendant did during the early days of the Covid-19 pandemic: it *lowered* its Delivery Fee, sometimes to FREE, and *raised* its menu prices by 25%-30% on delivery orders only.

46.     Because it is well known that American consumers prefer FREE or low-cost delivery costs, Chick-fil-A made an intentional decision to absorb delivery charges into hidden menu upcharges.

47.     Instead of fairly and transparently disclosing this change to its customers—who were already under tremendous stress from the pandemic—Chick-fil-A chose to operate in the shadows. It continued to make a clear promise that the total, marginal cost of having food delivered versus picking it up in store was represented by a new FREE or $2.99 or $3.99 Delivery Fee.

48.     But because it secretly inflated menu prices on delivery orders only, and never

informed customers of this policy, it misrepresented the true cost of delivery.

49.     Chick-fil-A intentionally deceived its customers regarding the true cost of its delivery service, hiding its delivery charges in menu price markups it never disclosed to its customers.

**D.    Chick-fil-A Prominently and Plainly Represents a Flat "Delivery Fee" on its App and Website.**

50.     Beginning in the early days of the Covid-19 pandemic, Chick-fil-A began prominently featuring FREE and low-cost delivery promises on its mobile application and on its website.

51.     Such representations often are made on the home screen of the app or website, and were always made on the check-out screen of the app and website, prior to the finalization of an order.  On that screen, Chick-fil-A promised a flat "Delivery Fee" that was FREE, $2.99 or $3.99. As an example, for supposed "FREE DELIVERY" orders, the order finalization screen states:

> Subtotal: [representing the cost of the food selected]
>
> Tax: [representing sales tax]
>
> Delivery Fee: FREE
>
> Tip:
>
> Total:  [adding up the above]

52.     As an example, for supposed "$3.99 Delivery Fee" orders, the order finalization screen states:

> Subtotal: [representing the cost of the food selected]
>
> Tax: [representing sales tax]
>
> Delivery Fee: $3.99
>
> Tip:

Total:  [adding up the above]

53.    In short, the Delivery Fee promises further the reasonable perception that such fee is what covers delivery costs.

**E.    Chick-fil-A Omits and Conceals Material Facts About the Costs of the Chick-fil-A Delivery Service.**

54.    But those disclosures were false and misleading, and the delivery charge was not, in fact, FREE or a flat fee of $2.99 or $3.99.

55.    Chick-fil-A furtively marked up the cost of food reflected in the "Subtotal"— adding a hefty 25-30% to the cost of the food items ordered for delivery. Chick-fil-A did not and does not make similar markups for identical food items ordered via the same app or website, where such items are ordered for pickup instead of delivery.

56.    Chick-fil-A omitted this material fact from its app and website disclosures, never informing users of this secret markup.

57.    Worse, Chick-fil-A designed its app to make it *impossible* for consumers to catch its hidden menu price inflation.  The company ensured that food prices were only displayed on the app or website *after* a customer chose delivery or pickup, ensuring delivery customers could not see the price inflation.

58.    This secret markup—which Chick-fil-A *only* applies to delivery orders—is a hidden delivery fee. This renders false Chick-fil-A's promise of a FREE or a flat, low-cost delivery fee of $2.99 or $3.99, which is made repeatedly in the app and the website, and then again in the "Delivery Fee" line item on the order screen.

59.    This secret markup was specifically designed to cover the costs of delivering food and profit on that delivery. It was, in short, exclusively a charge for using Chick-fil-A's delivery service.

60.     In short, the "Delivery Fee" is not actually $2.99 or $3.99. The actual "Delivery Fee"—the extra charge for having food delivered as opposed to picking it up—is the listed "Delivery Fee" *plus* the hidden food markup applied exclusively to delivery orders.

61.     Chick-fil-A does not inform consumers the true costs of its delivery service and it misrepresents its "Delivery Fee" as $2.99 or $3.99, when in fact that cost is actually much higher.

**F.     Other Restaurant Industry Actors Disclose Delivery Fees Fairly and Transparently—And Chick-fil-A Did So Before it Changed its Practice.**

62.     By unfairly obscuring its true delivery costs, Chick-fil-A deceives consumers and gains an unfair upper hand on competitors that fairly disclose their true delivery charges. For example, other restaurants like Del Taco and El Pollo Loco both offer delivery services through their app and website.  But unlike Chick-fil-A, Del Taco and El Pollo Loco fairly and prominently represent their true delivery charges.

63.     For example, Del Taco does not mark-up food charges for delivery orders through its app. Instead, for delivery orders its ordering screen presents the following:

> Subtotal:
>
> Tax:
>
> Delivery Charge:
>
> Tip:

64.     All line-item amounts are **<u>identical</u>** for delivery and pick-up orders, except for the plainly and fairly disclosed delivery charge—allowing consumers to understand the true cost of the delivery service.

65.     Similarly, El Pollo Loco does not mark-up food charges for delivery orders through its app. Instead, for delivery orders its ordering screen presents the following:

> Subtotal:

Delivery Charge:

Tax:

66.     All line-item amounts are **identical** for delivery and pick-up orders, except for the plainly and fairly disclosed delivery charge—allowing consumers to understand the true cost of the delivery service.

67.     As described above, this is exactly what Chick-fil-A itself did prior to the Covid-19 pandemic.

68.     Lastly, although Instacart, the grocery delivery service, does mark-up item charges for delivery orders made through its app, it provides an express warning to consumers that the item prices listed on its app are "higher than in-store prices." Instacart's clear disclaimer is made visible to consumers before they place their orders and allows consumers to understand that they are paying a higher price for utilizing the delivery service, as opposed to what they would pay had they purchased the same items in-store.

**G.     Plaintiff Brown's Experience**

69.     As an example, from within Virginia, Plaintiff Brown made an online purchase of food from the Chick-fil-A restaurant located in Glen Allen, Virginia on July 21, 2021, in the total amount of $24.77.

70.     Prior to placing her order, the Chick-fil-A app stated that the Delivery Fee was $2.99.

71.     However, the cost of food ordered by Plaintiff Brown bore a hidden delivery fee markup.

72.     Upon information and belief, the same item would have cost Plaintiff Brown 25-30% less than what she paid had she picked it up from the Chick-fil-A location instead.

73.     Plaintiff Brown would not have made the purchase had she known the Chick-fil-A delivery fee was not in fact $2.99.

74.     If she had known the true delivery fee, she would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

**H.     Plaintiff Clarke's Experience**

75.     As an example, from within Virginia, Plaintiff Clarke made an online purchase of food from the Chick-fil-A restaurant located in Richmond, Virginia on October 6, 2021, in the total amount of $35.40.

76.     Prior to placing her order, the Chick-fil-A app stated that the Delivery Fee was $2.99.

77.     However, the cost of food ordered by Plaintiff Clarke bore a hidden delivery fee markup.

78.     Upon information and belief, the same item would have cost Plaintiff Clarke 25-30% less than what she paid had she picked it up from the Chick-fil-A location instead.

79.     Plaintiff Clarke would not have made the purchase had she known the Chick-fil-A delivery fee was not in fact $2.99.

80.     If she had known the true delivery fee, she would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

**I.     Plaintiff Johnson's Experience**

81.     As an example, from within Texas, Plaintiff Johnson made an online purchase of food from the Chick-fil-A restaurant located in Forth Worth, Texas on September 28, 2022, in the total amount of $49.47.

82.     Prior to placing his order, the Chick-fil-A app stated that the Delivery Fee was

$3.99.

83.    However, the cost of food ordered by Plaintiff Johnson bore a hidden delivery fee markup.

84.    Upon information and belief, the same item would have cost Plaintiff Johnson 25-30% less than what he paid had he picked it up from the Chick-fil-A location instead.

85.    Plaintiff Johnson would not have made the purchase had she known the Chick-fil-A delivery fee was not in fact $3.99.

86.    If he had known the true delivery fee, he would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

**J.     Plaintiff Greetan's Experience**

87.    As an example, from within Arkansas, Plaintiff Greetan made an online purchase of food from the Chick-fil-A restaurant located in Bentonville, Arkansas on September 2, 2021, in the total amount of $38.50.

88.    Prior to placing his order, the Chick-fil-A app stated that the Delivery Fee was $2.99.

89.    However, the cost of food ordered by Plaintiff Greetan bore a hidden delivery fee markup.

90.    Upon information and belief, the same item would have cost Plaintiff Greetan 25-30% less than what he paid had he picked it up from the Chick-fil-A location instead.

91.    Plaintiff Greetan would not have made the purchase had he known the Chick-fil-A delivery fee was not in fact $2.99.

92.    If he had known the true delivery fee, he would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

**K.      Plaintiff Frazier's Experience**

93.      As an example, from within Maryland, Plaintiff Frazier made an online purchase of food from the Chick-fil-A restaurant located in Columbia, Maryland on February 12, 2021, in the total amount of $32.86.

94.      Prior to placing her order, the Chick-fil-A app stated that the Delivery Fee was $2.99.

95.      However, the cost of food ordered by Plaintiff Frazier bore a hidden delivery fee markup.

96.      Upon information and belief, the same item would have cost Plaintiff Frazier 25-30% less than what she paid had she picked it up from the Chick-fil-A location instead.

97.      Plaintiff Frazier would not have made the purchase had she known the Chick-fil-A delivery fee was not in fact $2.99.

98.      If she had known the true delivery fee, she would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

**L.      Plaintiff Rabon's Experience**

99.      As an example, from within South Carolina, Plaintiff Rabon made an online purchase of food from the Chick-fil-A restaurant located in North Myrtle Beach, South Carolina on October 14, 2021, in the total amount of $18.62.

100.      Prior to placing her order, the Chick-fil-A app stated that the Delivery Fee was $2.99.

101.      However, the cost of food ordered by Plaintiff Rabon bore a hidden delivery fee markup.

102.      Upon information and belief, the same item would have cost Plaintiff Rabon 25-

30% less than what she paid had she picked it up from the Chick-fil-A location instead.

103.     Plaintiff Rabon would not have made the purchase had she known the Chick-fil-A delivery fee was not in fact $2.99.

104.     If she had known the true delivery fee, she would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

## CLASS ALLEGATIONS

105.     Pursuant to Rule 23, Plaintiffs bring this action individually and as a class action of similarly situated persons, on behalf of the following proposed Classes:

> **Nationwide Class:** All persons who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

> **Virginia Class:** All persons in Virginia who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

> **Texas Class:** All persons in Texas who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

> **Arkansas Class:** All persons in Arkansas who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

> **Maryland Class:** All persons in Maryland who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

> **South Carolina Class:** All persons in South Carolina who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

106.     Excluded from the Classes is Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

107.     **Numerosity**:  At this time, Plaintiffs do not know the exact size of the Classes; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are well into the thousands, and thus are so numerous that joinder of all members is impractical.  The number and identities of the members of each Class is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

108.     **Commonality**:  There are questions of law or fact common to the Class, which include, but are not limited to the following:

a.     Whether during the class period, Defendant deceptively and/or negligently misrepresented Delivery Fees on food deliveries ordered through the Chick-fil-A website and mobile app;

b.     Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

c.      Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

d.      Whether Defendant's alleged conduct constitutes violations of the laws asserted;

e.      Whether Plaintiffs and members of the Classes were harmed by Defendant's misrepresentations;

f.      Whether Plaintiffs and the Classes have been damaged, and if so, the proper measure of damages; and

g.      Whether an injunction is necessary to prevent Defendant from continuing to deceptively represent low-price, flat delivery fees on food deliveries ordered through the Chick-fil-A website and mobile app.

109.    **Typicality**: Like Plaintiffs, many other consumers ordered food for delivery from Chick-fil-A's website or mobile app, believing delivery to be the flat fee represented based on Defendant's representations. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs and each Class member was injured by Defendant's false representations about the true nature of the delivery fee. Plaintiffs and the Classes have suffered the same or similar injury as a result of Defendant's false, deceptive and misleading representations. Plaintiffs' claims and the claims of members of the Class emanate from the same legal theory, Plaintiffs' claims are typical of the claims of the Class, and, therefore, class treatment is appropriate.

110.    **Adequacy of Representation**: Plaintiffs are committed to pursuing this action and have retained counsel competent and experienced in prosecuting and resolving consumer class actions. Plaintiffs will fairly and adequately represent the interests of the Classes and do not have any interests adverse to those of the Class.

111.     **The Proposed Class Satisfies the Prerequisites for Injunctive Relief**. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Plaintiffs remain interested in ordering food for delivery through Chick-fil-A's website and mobile app; there is no way for them to know when or if Defendant will cease deceptively misrepresenting the cost of delivery.

112.     Specifically, Defendant should be ordered to cease from representing their delivery service as a low-price, flat delivery fee and to disclose the true nature of their delivery fee.

113.     Defendant's ongoing and systematic practices make declaratory relief with respect to the Class appropriate.

114.     **The Proposed Class Satisfies the Prerequisites for Damages**. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual Class member.

<u>**FIRST CLAIM FOR RELIEF**</u>
<u>**CAUSE OF ACTION**</u>
**Negligent Misrepresentation**
**(Asserted on Behalf of Plaintiffs and the Classes)**

115.     Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

116.     This cause of action is brought on behalf of all Plaintiffs and all the Classes.

117.     Defendant has negligently misrepresented, on its website and mobile app, that delivery of Chick-Fil-A food is FREE or a flat, low price, when, in reality, it hides delivery charges through hidden food markups applied exclusively to delivery orders.

118.    Defendant, in promoting and marketing its food delivery service to consumers, had a duty of care to inform customers of the true costs of having its food delivered. These are material facts that were only known by Defendant, but they were never disclosed to consumers.

119.    Defendant made misrepresentations of material fact that were false. Namely, by repeatedly marketing the cost of food delivery as FREE or a flat, low price, but, in actuality, it imposed hidden delivery charges on its customers by secretly marking up food prices for delivery orders only.

120.    Defendant knows its misrepresentations about delivery costs are material to the reasonable consumer.

121.    Defendant knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether or not to order food for delivery from Defendant.

122.    Defendant was negligent because it knew or should have known that its representations in marketing materials about the cost of delivery were false, inaccurate, and misleading.

123.    Defendant omitted the fact that as a matter of secret policy, delivery charges were added over and above those represented.

124.    Plaintiffs and members of the Classes justifiably acted in reliance upon Defendant's false and misleading statements by ordering food for delivery at the represented delivery cost.

125.    Neither Plaintiffs nor any reasonable consumer would have ordered food delivery if they had known of the true cost of it – a cost Defendant alone was aware of and actively misrepresented.

126.     As a direct and proximate result of Defendant's misrepresentations, Plaintiffs and members of the Classes were induced into using the delivery service and have been harmed and suffered actual damages in the amount of delivery costs paid in excess of those expressly represented.

127.     Plaintiffs seek all available remedies, damages, and awards as a result of Defendant's negligent misrepresentations in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**CAUSE OF ACTION**
**Violation of Virginia's Consumer Protection Act**
**(Va. Code Ann. §59.1-196, *et seq.*)**

128.     Plaintiffs Brown and Clarke incorporate by reference and reallege herein all paragraphs alleged above.

129.     This cause of action is brought on behalf of Plaintiffs Brown and Clarke and the Virginia Class (for purposes of this section, the "Class").

130.     Defendant, Plaintiffs, and the Class members are "[p]erson[s]" within the meaning of Va. Code Ann. § 59.1-198.

131.     Defendant was and is a "Supplier" within the meaning of Va. Code Ann. § 59.1-198.

132.     The Virginia Consumer Protection Act of 1977 ("Virginia CPA") prohibits "fraudulent acts or practices committed by a supplier in connection with a consumer transaction." Va. Code Ann. § 59.1-200(A).

133.     The Virginia CPA makes unlawful specific acts, including:

   a.  "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits" (Va. Code Ann. § 59.1-200(A)(5));

b. "[m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model" (Va. Code Ann. § 59.1-200(A)(6));

c. "[a]dvertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised" (Va. Code Ann. § 59.1-200(A)(8)); and

d. "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" (Va. Code Ann. § 59.1-200(A)(14)).

134.    In the course of its business, Defendant, through its agents and/or employees, violated the Virginia CPA by knowingly and intentionally misrepresenting, omitting, concealing and failing to disclose material facts regarding the true cost of its food delivery service.

135.    Specifically, Defendant affirmatively misrepresented on its website and mobile app that it provides a FREE or a flat, low-cost delivery fee for food orders – a material fact that was false because, in reality, it hides delivery charges through hidden food markups applied exclusively to delivery orders. In so doing, Defendant engaged in one or more of the following unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Virginia CPA, including:

a. representing that food delivery orders have characteristics, uses, benefits, and qualities which they do not have;

b.  representing that food deliver orders are of a particular standard, quality, and grade when they are not;

c. advertising food delivery orders with the intent not to sell them as advertised; and

d. engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

136.    Defendant's misrepresentations and omissions regarding delivery costs were disseminated to Plaintiffs Brown and Clarke and the Virginia Class members in a uniform manner.

137.    Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about the true costs of its delivery service.

138.    Defendant's scheme and concealment of the true cost of its delivery fee was material to Plaintiffs Brown and Clarke and the other Virginia Class members as Defendant intended. Had they known the truth, Plaintiff Brown and Clark and the other Virginia Class members would not have made the purchase or would have chosen another method for receiving food from Defendant.

139.    Plaintiffs Brown and Clarke and the other members of the Virginia Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

140.    Defendant had an ongoing duty to Plaintiffs Brown and Clarke and the other Virginia Class members to refrain from unfair and deceptive practices under the Virginia CPA in the course of its business. Specifically, Defendant owed Plaintiffs Brown and Clarke and the other Virginia Class members a duty to disclose all of the material facts concerning the true cost of its delivery service because Defendant possessed exclusive knowledge and intentionally concealed it from Plaintiffs Brown and Clarke and the other members of the Virginia Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

141.    Plaintiffs Brown and Clarke and the other Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment,

misrepresentations, and/or failure to disclose material information. Specifically, Plaintiff and the Class members ordered food for delivery in reliance on Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the true cost of its food delivery service.

142.    Defendant's violations present a continuing risk to Plaintiffs Brown and Clarke and the other members of the Virginia Class.

143.    As a result of Defendant's violations of the Virginia CPA, Plaintiffs Brown and Clark and the other members of the Virginia Class seek an order: 1) enjoining Defendant's unfair and/or deceptive acts or practices; 2) awarding general and punitive damages in an amount to be proven at trial; 3) awarding costs and attorneys' fees; and 4) awarding any other just and proper relief available under the Virginia CPA.

### THIRD CLAIM FOR RELIEF
### CAUSE OF ACTION
**Violation of Texas's Deceptive Trade Practices-Consumer Protection Act**
**(Tex. Bus. & Com. Code Ann. § 17.41, *et. seq.*)**

144.    Plaintiff Johnson incorporates by reference and realleges herein all paragraphs alleged above.

145.    This cause of action is brought on behalf of Plaintiff Johnson and the Texas Class (for purposes of this section, the "Class").

146.    Defendant, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of Tex. Bus. & Com. Code Ann. §17.45(3).

147.    Plaintiff and the Class members are "[c]onsumer[s]" within the meaning of Tex. Bus. & Com. Code Ann. §17.45(4).

148.    Defendant's products are "[g]oods" within the meaning of Tex. Bus. & Com. Code Ann. §17.45(1).

149.   Defendant was and is engaged in "[t]rade" or "commerce" within the meaning of Tex. Bus. & Com. Code Ann. §17.45(6).

150.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code Ann. §17.46(a), and an "[u]nconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code Ann. §§17.45(5) and 17.50(a)(3).

151.   The Texas DTPA makes unlawful specific acts, including:

   a.   "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" (Tex. Bus. & Com. Code Ann. §17.46(b)(5)));

   b.   "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (Tex. Bus. & Com. Code Ann. §17.46(b)(7)); and

   c.   "advertising goods or services with intent not to sell them as advertised" (Tex. Bus. & Com. Code Ann. §17.46(b)(9)).

152.   In the course of its business, Defendant, through its agents and/or employees, violated the Texas DTPA by knowingly and intentionally misrepresenting, omitting, concealing and failing to disclose material facts regarding the true cost of its food delivery service.

153.   Specifically, Defendant affirmatively misrepresented on its website and mobile app that it provides a FREE or a flat, low-cost delivery fee for food orders – a material fact that was false because, in reality, it hides delivery charges through hidden food markups applied exclusively to delivery orders. In so doing, Defendant engaged in one or more of the following unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Texas DTPA, including:

a.  representing that food delivery orders have characteristics, uses, benefits, and qualities which they do not have;

b.   representing that food deliver orders are of a particular standard, quality, and grade when they are not; and

c.  advertising food delivery orders with the intent not to sell them as advertised.

154.   Defendant's misrepresentations and omissions regarding delivery costs were disseminated to Plaintiff Johnson and the Texas Class members in a uniform manner.

155.   Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about the true costs of its delivery service.

156.   Defendant's scheme and concealment of the true cost of its delivery fee was material to Plaintiff Johnson and the other Texas Class members as Defendant intended. Had they known the truth, Plaintiff Johnson and the other Texas Class members would not have made the purchase or would have chosen another method for receiving food from Defendant.

157.   Plaintiff Johnson and the other members of the Texas Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff Brown and Texas Class members did not, and could not, unravel Defendant's deception on their own.

158.   Defendant had an ongoing duty to Plaintiff Johnson and the other Texas Class members to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business. Specifically, Defendant owed Plaintiff Johnson and the other Texas Class members a duty to disclose all of the material facts concerning the true cost of its delivery service because

Defendant possessed exclusive knowledge and intentionally concealed it from Plaintiff Johnson and the other members of the Texas Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

159.    Plaintiff Johnson and the other Texas Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information. Specifically, Plaintiff and the Class members ordered food for delivery in reliance on Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the true cost of its food delivery service.

160.    Defendant's violations present a continuing risk to Plaintiff Johnson and the other members of the Texas Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

161.    As a result of Defendant's violations of the Texas DTPA, Plaintiff Johnson and the other members of the Texas Class seek an order: 1) enjoining Defendant's unfair and/or deceptive acts or practices; 2) awarding general and punitive damages in an amount to be proven at trial; 3) awarding costs and attorneys' fees; and 4) awarding any other just and proper relief available under the Texas DTPA.

**FOURTH CLAIM FOR RELIEF**
**CAUSE OF ACTION**
**Violation of Arkansas' Deceptive Trade Practices Act**
**(Ark. Code Ann. § 4-88-101, *et seq.*)**

162.    Plaintiff Greetan incorporates by reference and realleges herein all paragraphs alleged above.

163.    This cause of action is brought on behalf of Plaintiff Greetan and the Arkansas Class (for purposes of this section, the "Class").

164.   Defendant, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of Ark. Code Ann. § 4-88-102(5).

165.   Defendant's products are "[g]oods" within the meaning of Ark. Code Ann. § 4-88-102(4).

166.   Defendant advertised, offered, or sold services in Arkansas and engaged in trade or commerce directly or indirectly affecting the people of Arkansas.

167.   The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices." Ark. Code Ann. § 4-88-107(a).

168.   The Arkansas DTPA makes unlawful specific acts, including:

a.   "[k]nowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval … or as to whether goods are … of a particular standard, quality, grade, style, or model" (Ark. Code Ann. §4-88-107(a)(1));

b.   "[a]dvertising the goods or services with the intent not to sell them as advertised" (Ark. Code Ann. §4-88-107(a)(3)); and

c.   "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade" (Ark. Code Ann. §4-88-107(a)(10)).

169.   The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; [or] (2) [t]he concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission . . . ." Ark. Code Ann. §4-88-108(a).

170.   As alleged herein, Defendant engaged in the concealment, suppression and omission of material facts, with intent that others rely upon the concealment, suppression or omission in violation of Ark. Code Ann. § 4-88-108(2), and engaged in unconscionable, false, or

deceptive act or practice in business, commerce, or trade, in violation of Ark. Code Ann. § 4-88-107.

171.    Specifically, Defendant affirmatively misrepresented on its website and mobile app that it provides a FREE or a flat, low-cost delivery fee for food orders – a material fact that was false because, in reality, it hides delivery charges through hidden food markups applied exclusively to delivery orders. In so doing, Defendant engaged in one or more of the following unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Arkansas DTPA, including:

   a.  representing that food delivery orders have characteristics, uses, benefits, and qualities which they do not have;

   b.   representing that food deliver orders are of a particular standard, quality, and grade when they are not;

   c.  advertising food delivery orders with the intent not to sell them as advertised; and

   d.  engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

172.    Defendant's misrepresentations and omissions regarding delivery costs were disseminated to Plaintiff Greetan and the Arkansas Class members in a uniform manner.

173.    Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff Greetan and the Class members, about the true costs of its delivery service.

174.    Defendant's scheme and concealment of the true cost of its delivery fee was material to Plaintiff Greetan and the other Arkansas Class members as Defendant intended. Had

they known the truth, Plaintiff Greetan and the other Arkansas Class members would not have made the purchase or would have chosen another method for receiving food from Defendant.

175.    Plaintiff Greetan and the other members of the Arkansas Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Class members did not, and could not, unravel Defendant's deception on their own.

176.    Defendant had an ongoing duty to Plaintiff Greetan and the other Arkansas Class members to refrain from unfair and deceptive practices under the Arkansas DTPA in the course of its business. Specifically, Defendant owed Plaintiff Greetan and the other Arkansas Class members a duty to disclose all of the material facts concerning the true cost of its delivery service because Defendant possessed exclusive knowledge and intentionally concealed it from Plaintiff Greetan and the other members of the Arkansas Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

177.    Plaintiff Greetan and the other Arkansas Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information. Specifically, Plaintiff and the Class members purchased food for delivery in reliance on Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the true cost of its food delivery service.

178.    Defendant's violations present a continuing risk to Plaintiff Greetan and the other members of the Arkansas Class.

179.    As a result of Defendnat's violations of the Arkansas DTPA, Plaintiff Greetan and the other members of the Arkansas Class seek an order: 1) enjoining Defendant's unfair and/or

deceptive acts or practices; 2) awarding actual damages in an amount to be proven at trial; 3) awarding costs and attorneys' fees; and 4) awarding any other just and proper relief available under the Arkansas DTPA.

**FIFTH CLAIM FOR RELIEF**
**CAUSE OF ACTION**
**Violation of Maryland's Consumer Protection Act**
**(Md. Code Ann., Com. Law § 13-101, *et seq.*)**

180.    Plaintiff Frazier incorporates by reference and realleges herein all paragraphs alleged above.

181.    This cause of action is brought on behalf of Plaintiff Frazier and the Maryland Class (for purposes of this section, the "Class").

182.    Defendant, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of Md. Code Ann., Com. Law §13-101(h).

183.    Plaintiff and the Class members are "[c]onsumer[s]" within the meaning of Md. Code Ann., Com. Law §13-101(c)(1).

184.    Defendant's products are "[m]erchandise" within the meaning of Md. Code Ann., Com. Law §13-101(f).

185.    The Maryland Consumer Protection Act ("Maryland CPA") prohibits "[u]nfair, abusive, or deceptive trade practices." Md. Code Ann., Com. Law §13-301.

186.    The Maryland CPA makes unlawful specific acts, including:

   a.    "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" (Md. Code Ann., Com. Law §13-301(1));

   b.    "[r]epresent[ing] that . . . [c]onsumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have" (Md. Code Ann., Com. Law §13-301(2)(i));

    c.   "[r]epresent[ing] that . . . [c]onsumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not" (Md. Code Ann., Com. Law §13-301(2)(iv));

    d.   "[f]ailure to state a material fact if the failure deceives or tends to deceive" (Md. Code Ann., Com. Law §13-301(3));

    e.   "[a]dvertis[ing] or offer[ing] of consumer goods, consumer realty, or consumer services . . . [w]ithout intent to sell, lease, or rent them as advertised or offered" (Md. Code Ann., Com. Law §13-301(5)(i)); and

    f.   "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods" (Md. Code Ann., Com. Law §13-301(9)(i)).

187.   In the course of its business, Defendant, through its agents and/or employees, violated the Maryland CPA by knowingly and intentionally misrepresenting, omitting, concealing and failing to disclose material facts regarding the true cost of its food delivery service.

188.   Specifically, Defendant affirmatively misrepresented on its website and mobile app that it provides a FREE or a flat, low-cost delivery fee for food orders – a material fact that was false because, in reality, it hides delivery charges through hidden food markups applied exclusively to delivery orders. In so doing, Defendant engaged in one or more of the following unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Maryland CPA, including:

    a.   representing that food delivery orders have characteristics, uses, benefits, and qualities which they do not have;

    b.   representing that food deliver orders are of a particular standard, quality, and grade when they are not;

    c.   advertising food delivery orders with the intent not to sell them as advertised;

    d.   failing to disclose the true cost of food delivery orders; and

    e.   engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

189.    Defendant's misrepresentations and omissions regarding delivery costs were disseminated to Plaintiff Frazier and the Maryland Class members in a uniform manner.

190.    Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about the true costs of its delivery service.

191.    Defendant's scheme and concealment of the true cost of its delivery fee was material to Plaintiff Frazier and the other Maryland Class members as Defendant intended. Had they known the truth, Plaintiff Frazier and the other Maryland Class members would not have made the purchase or would have chosen another method for receiving food from Defendant.

192.    Plaintiff Frazier and the Maryland Class members relied on Defendant's misrepresentations, omissions, and concealments with respect to its prices for food delivery by purchasing and continuing to purchase food for delivery after Defendant's misrepresentations, omissions, and concealments were made.

193.    Plaintiff Frazier and the other members of the Maryland Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff Frazier and Maryland Class members did not, and could not, unravel Defendant's deception on their own.

194.    Defendant had an ongoing duty to Plaintiff Frazier and the other Maryland Class members to refrain from unfair and deceptive practices under the Maryland CPA in the course of its business. Specifically, Defendant owed Plaintiff Frazier and the other Maryland Class members a duty to disclose all of the material facts concerning the true cost of its delivery service because

Defendant possessed exclusive knowledge and intentionally concealed it from Plaintiff Frazier and the other members of the Maryland Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

195.    Plaintiff Frazier and the other Maryland Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information. Specifically, Plaintiff and the Class members ordered food for delivery in reliance on Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the true cost of its food delivery service.

196.    Defendant's violations present a continuing risk to Plaintiff Frazier and the other members of the Maryland Class.

197.    As a result of Defendant's violatoins of the Maryland CPA, Plaintiff Frazier and the other members of the Maryland Class seek an order: 1) enjoining Defendant's unfair and/or deceptive acts or practices; 2) awarding actual damages in an amount to be proven at trial; 3) awarding costs and attorneys' fees; and 4) awarding any other just and proper relief available under the Maryland CPA.

**SIXTH CLAIM FOR RELIEF**
**CAUSE OF ACTION**
**Violation of South Carolina's Unfair Trade Practices Act**
**(S.C. Code Ann. § 39-5-10, *et seq.*)**

198.    Plaintiff Rabon incorporates by reference and realleges herein all paragraphs alleged above.

199.    This cause of action is brought on behalf of Plaintiff Rabon and the South Carolina Class (for purposes of this section, the "Class").

200.     Defendant, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of S.C. Code Ann. §39-5-10(a).

201.     Defendant was and is engaged in "[t]rade" or "commerce" within the meaning of S.C. Code Ann. §39-5-10(b).

202.     The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. §39-5-20(a).

203.     In the course of its business, Defendant, through its agents and/or employees, violated the South Carolina UTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding true cost of its food delivery service.

204.     Specifically, by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding the true costs of its food deliver service, as detailed above, Defendant engaged in one or more unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the South Carolina UTPA.

205.     Defendant's misrepresentations and omissions regarding delivery costs were disseminated to Plaintiff Rabon and the South Carolina Class members in a uniform manner.

206.     Defendant's unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about the true costs of its delivery service.

207.     Defendant's scheme and concealment of the true cost of its delivery fee was material to Plaintiff Rabon and the other South Carolina Class members as Defendant intended.

Had they known the truth, Plaintiff Rabon and the other South Carolina Class members would not have made the purchase or would have chosen another method for receiving food from Defendant.

208.    Plaintiff Rabon and the other members of the South Carolina Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff Rabon and South Carolina Class members did not, and could not, unravel Defendant's deception on their own.

209.    Defendant had an ongoing duty to Plaintiff Rabon and the other South Carolina Class members to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of its business. Specifically, Defendant owed Plaintiff Rabon and the other South Carolina Class members a duty to disclose all of the material facts concerning the true cost of its delivery service because Defendant possessed exclusive knowledge and intentionally concealed it from Plaintiff Rabon and the other members of the South Carolina Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

210.    Plaintiff Rabon and the other South Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information. Specifically, Plaintiff and the Class members ordered food for delivery in reliance on Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the true cost of its food delivery service.

211.    Defendant's violations present a continuing risk to Plaintiff Rabon and the other members of the South Carolina Class.

212.     As a result of Defendnat's violations of the South Carolina UTPA, Plaintiff Rabon and the other members of the South Carolina Class seek an order: 1) enjoining Defendant's unfair and/or deceptive acts or practices; 2) awarding general and punitive damages in an amount to be proven at trial; 3) awarding costs and attorneys' fees; and 4) awarding any other just and proper relief available under the South Carolina UTPA.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract
### (Asserted on behalf of all Classes)

213.     Plaintiffs repeats and re-alleges the above allegations as if fully set forth herein.

214.     Plaintiffs and Chick-fil-A have contracted for food delivery services, as embodied in the representations made in the Chick-fil-A app and website.

215.     No contract provision authorizes Chick-fil-A be able to impose hidden delivery charges on its customers in addition to the "delivery charge" represented in its app and on its website.

216.     Chick-fil-A breached the terms of its contract with consumers by charging an additional 25-30% more for food items ordered for "delivery" than the contracted-for "delivery charge."

217.     Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

218.     Plaintiffs and members of the Class have sustained damages as a result of Defendant's breach of the contract and breach of the implied covenant of good faith and fair dealing.

## EIGHT CLAIM FOR RELIEF
### Unjust Enrichment
### (Asserted on behalf of Plaintiffs and thr Classes)

219.     Plaintiffs repeats and re-alleges the above allegations as if fully set forth herein.

220.    This Count is brought solely in the alternative. Plaintiff acknowledges that the breach of contract claim cannot be tried along with unjust enrichment.

221.    To the detriment of Plaintiff and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

222.    Defendant unfairly, deceptively, unjustly, and/or unlawfully seized and accepted said benefits which, under the circumstances, would be unjust to allow Defendant to retain.

223.    Plaintiff and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes seek judgment in an amount to be determined at trial, as follows:

(a)     For an order enjoining Defendant from continuing the unlawful practices set forth above;

(b)     For declaratory and injunctive relief as set forth above;

(c)     For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d)     For compensatory damages according to proof;

(e)     For punitive damages according to proof;

(f)     For reasonable attorneys' fees and costs of suit;

(g)     For pre-judgment interest; and

(h)     Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated:  October 3, 2023

Respectfully Submitted,

*/s/ Andrew J. Shamis*
Andrew J. Shamis
Georgia Bar No. 49496
Edwin E. Elliott*
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Jeffrey D. Kaliel*
Sophia Goren Gold*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com

Scott Edelsberg*
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
adam@edelsberglaw.com

*Pro Hac Vice* forthcoming

*Counsel for Plaintiffs and the Proposed Classes*